BARNES, Respondent, v. LOZOFF, Appellant.

*September 4—October 1, 1963.*

648

For the appellant there was a brief by *Charne & Tehan* of Milwaukee, and oral argument by *Irvin B. Charne*.

For the respondent there was a brief by *Wolf, Haese, Emmert & Wilking* of Milwaukee, and oral argument by *William J. Haese*.

WILKIE, J. The first issue raised on this appeal is as follows: Is a professional engineer entitled to the reasonable value of his services when, in pursuance of an agreement to draft final plans and specifications for a motel, he prepares preliminary plans, specifications, and renderings based upon representations as to the client's property and other data wholly supplied by his client, if such preliminary plans, specifications, and renderings are valueless because they incorporate into the design of the parking area for the said motel, property not owned by the client?

This court has held that a professional person performing technical services may receive the reasonable value of such services for partial performance upon a contract which cannot be fully executed, if his performance was conducted in good faith.[1] Cases from other jurisdictions have held that architects and engineers may recover the reasonable value of their services in *quantum meruit* for drafting preliminary plans and specifications which cannot be translated into final design, if their performance was undertaken in good faith.[2]

We must then ask, was Barnes acting in good faith when he drafted the preliminary plans and specifications and renderings for Lozoff? The contract contemplated two distinct performances by Barnes. He was to create the final design for the motel if appropriate financing could be found, and he was to draft the preliminary plans and renderings, which would be utilized to secure such financing. This was the task that he undertook. In determining whether he acted in good faith by relying upon Lozoff's representations as to the scope of his property ownership, we inquire, did he use the skill and judgment common among members of his profession?

"As a general rule, it may be said that as far as the preparation of plans is concerned, an architect [engineer] acts as an independent contractor, and his relationship with his employer is characterized as one of trust and confidence. Thus, good faith and loyalty to his employer constitute a primary duty of the architect [engineer]. In this regard, he is duty bound to make a full disclosure of all matters of which he has knowledge, and of which it would be desirable or important that his employer should be informed.

[1] *Guentner v. Gnagi* (1951), 258 Wis. 383, 46 N. W. (2d) 194.

[2] *Polak v. Kramer* (1933), 116 Conn. 688, 166 Atl. 396; *Sterling v. Marshall* (D. C. Mun. Ct. App. 1947), 54 Atl. (2d) 353; *Parrish v. Tahtaras* (1957), 7 Utah (2d) 87, 318 Pac. (2d) 642; 5 Corbin, Contracts, p. 473, sec. 1107, citing cases therein.

"By his contract, the architect [engineer] implies that he possesses the necessary competence and ability, including taste, to enable him to furnish plans and specifications prepared with a reasonable degree of technical skill. . . . This skill and ability which he is bound to exercise *are such as are ordinarily required of architects [engineers], which is a higher degree than that required of unskilled* persons. In testing the architect's [engineer's] competence, however, consideration should be given only to the knowledge that was available to his profession at the time he was employed." [3] (Emphasis added.)

On the record, the only testimony relating to an engineer's responsibility for determining ownership of property incorporated in the plans and specifications is Barnes' uncontroverted statement: "We normally work from surveys." In this case, the survey was provided at the direction of Lozoff. Barnes testified that engineers, as a class, would regard the plat survey as a description of a lot divided into parcels. Therefore, on this information, coupled with Lozoff's representation at the proposed site of construction, that he owned *"a lot"* on Highway 100, indicating this area with a wave of his hand, it is obvious that Barnes was following the standard practice of a professional engineer in drafting the parking design. Furthermore, at the time the parties entered into negotiations, Lozoff was well aware of the number of parking spaces that could be marked out on the lot he in fact owned on Highway 100. The testimony revealed that in 1960 he had received a plat survey indicating the space available for parking places. There can be no other conclusion than that Barnes undertook partial performance of this contract in good faith. An engineer is not required by the standards of his profession to conduct a title search on property which his client represents to be his own. That the plans are presently valueless is not relevant to the issue presented. As has been noted:

---

[3] Anno. 25 A. L. R. (2d) 1086.

"In fixing the outer limits of quasi-contract restitution the key word, again, is 'benefit' and its meaning, again, is shaped by the context. Where the contract is fully enforceable, its own terms provide the starting point in determining whether a benefit has been conferred. The question becomes whether something has been transferred, done or not done that was, in the language of the *Restatement,* 'a part or all of a performance for which the defendant bargained.' [Restatement, Contracts, sec. 347 (1932)] It is assumed that in any event the injured party can insist on full indemnity in some form of action. No purpose therefore would be served by modifying the basic risks of gain or loss imposed by the original contract, as would occur if some kind of additional showing were required that the transfer, act or abstention 'requested' produced some net advantage to the defaulting promisor. There is transferred to the restitution remedy, in other words, an underlying assumption of a regime of free contract, that the reasons motivating private exchanges and the calculation of advantages to be secured thereby are left to individual determination. This assumption is strongly confirmed by adopting as the *measure* of benefit a market value standard, . . . It therefore becomes unnecessary to inquire whether the performance 'requested' or 'bargained for' produced net gain of any kind. There are many illustrations. As instructive as any are the numerous cases where architects are promised reimbursement, usually on a basis of percentage-of-cost, for preparing plans for a structure that is never built, so that the plans are useless." [4]

Lozoff bargained for a drafting of preliminary plans and specifications. This is what he received from Barnes based upon information that Lozoff had supplied.

The second issue on this appeal may be stated as follows: Is the appropriate measure of the reasonable value of the services a percentage of the cost of construction, or actual costs plus reasonable profit, determined by an hourly rate formula?

[4] Dawson, Restitution or Damages, 20 Ohio State Law Journal (1959), 175, 190.

The measure of damages for one seeking the reasonable value of services in *quantum meruit* is defined in terms of the "rate of pay for such work in the community at the time the work was performed." [5]

The drafting of preliminary plans and specifications was the service performed in this case. The only testimony in the record relating to the "rate of pay for such work in the community" was Barnes' uncontradicted testimony that such services were compensated on a percentage-of-the-cost-of-construction basis, *i.e.,* one percent of the estimated costs of construction. On the evidence adduced, that figure is equivalent to the damages assessed. Therefore, the court properly applied the correct measure of recovery.

We cannot close our consideration of this case without recalling what we said in *Mead, supra,* at page 529a:

"We cannot refrain from calling attention to the fact that a nominal sum spent for the drafting of an appropriate contract would have avoided this litigation. In the discussion necessary for the preparation of such a contract there would of necessity have been a meeting of the minds of the parties on the details before it could have been reduced to writing."

Parties who reach "an agreement" with a wave of the hand, or by jotting notes on a dinner napkin may expect disagreements to develop and expensive litigation to follow.

*By the Court.*—Judgment affirmed.

---

[5] *Mead v. Ringling* (1954), 266 Wis. 523, 529, 64 N. W. (2d) 222, 65 N. W. (2d) 35.