HARPER, DRAKE & ASSOCIATES, INC., Respondent, v.
JEWETT & SHERMAN COMPANY, Appellant.

*No. 159. Argued November 30, 1970.—Decided January 5, 1971.*
(Also reported in 182 N. W. 2d 551.)

332

For the appellant there was a brief by *Grootemaat, Cook & Franke,* attorneys, and *David J. Hase* of counsel, all of Milwaukee, and oral argument by *Mr. Hase.*

For the respondent there was a brief by *Cahill, Fox & Smith,* attorneys, and *Daniel O. Ryan, Jr.,* of counsel, all of Milwaukee, and oral argument by *Mr. Ryan.*

HANLEY, J. The following issues are presented on appeal:

(1) When a written, proposed contract is unexecuted and unenforceable may resort be had to one of its terms in determining the reasonable value of an architect's services; if not,

(2) Then is the remaining evidence in the record as to reasonable value of services sufficient to support the verdict; and

(3) Was there a rational and credible basis for the amount claimed by Harper for the services of Richard Kirsch?

*Resort to one term of an unexecuted and unenforceable contract.*

The jury verdict broke down as follows:

| | |
|---|---:|
| Architectural services | $14,141.00 |
| Plumbing consulting services | 600.00 |
| Heating, ventilating and air-conditioning consulting services | 1,050.00 |
| Electrical consulting services | 787.50 |
| Landscape architecture consulting services | 2,870.00 |
| | $19,448.50 |

On appeal, only the first item on this list is in dispute. Respondent contended at trial that the reasonable value of the architectural services rendered by himself and his staff could be arrived at in either of two ways. The first would be to simply accept his percentage computations based on the terms of the contract.[2] The second would be to accept the evidence he offered of the time spent on the project by his office. Respondent explained at trial that when he billed on an hourly basis, he took each employee's hourly rate, multiplied that by a profit and overhead factor of 2.5 and then multiplied the resulting figure by the number of hours worked by the employee. Under this approach Harper submitted the following figures as to the reasonable value of the services of himself and his staff: [3]

---

[2] If reference to the contract is proper at all, then there is no dispute as to the figure arrived at by the respondent under that method. But appellants contend that using the contract is not proper since it was never executed.

[3] There is no dispute as to the reasonableness of this method. The only dispute related to how many hours Harper himself devoted to this project.

| Architect or Draftsman | Hourly rate times factor | Hours times gross hourly rate | Value of services |
|---|---|---|---|
| Harper | 15 x 2.5 = 37.50 | 156 x 37.50 = | $ 5,850.00 |
| Drake | 15 x 2.5 = 37.50 | 65 x 37.50 = | 2,437.50 |
| Kirsch | 5 x 2.5 = 12.50 | 160.5 x 12.50 = | 2,006.25 |
| Kinnich | 10 x 2.5 = 25.00 | 8 x 25.00 = | 200.00 |
| Arndt | 7.5 x 2.5 = 18.75 | 7.5 x 18.75 = | 140.63 |
| Groff | 5 x 2.5 = 12.50 | 6.5 x 12.50 = | 81.25 |
| Knoll | 5 x 2.5 = 12.50 | 8 x 12.50 = | 100.00 |
| Guerin | 10 x 2.5 = 25.00 | 6 x 25.00 = | 150.00 |

Total $ 10,965.63

The jury's award for architectural services was $14,141. There is no way of knowing how the jury reached that figure. If they used the hours expended approach, then the verdict is clearly excessive in the amount $3,175.37 (*i.e.,* he proved $10,965.63, but they gave him $14,141 or $3,175.37 more than he proved).

On oral argument, respondent's attorney admitted that, as to this item, there was no specific evidence to support the extra $3,175.37. He speculated that the jury must have compromised and used parts of each approach (*i.e.,* a combination of the percentage of cost method and the hours expended method).

Obviously, the respondent was only entitled to be compensated once, and since each method represents a separate and distinct means of answering the same question (*i.e.,* What is the reasonable value of respondent's architectural services?), a combination of those methods would be improper.

Respondent acknowledges this, but points out that the demand in the complaint was for $21,727.12. He then argues that the jury might have used only the percentage of cost of construction method in arriving at its special verdict of $19,448.50. He contends that this court has previously approved the percentage cost of construction approach and, therefore, the court should not disturb the verdict.

The respondent cites *Barnes v. Lozoff* (1963), 20 Wis. 2d 644, 123 N. W. 2d 543, for the proposition that a percentage of cost of construction is the proper measure of an architect's services in an action for *quantum meruit*. The *Barnes Case* did so hold, but in *Barnes* the supreme court noted and accepted the trial court's conclusion of law to the effect that an actual "contract" existed between the parties. One of the terms of that contract was that the plaintiff would be paid on a percentage basis. The defendant builder in *Barnes* abandoned the project. As a result the plaintiff was unable to fully perform the contract. Consequently, his cause of action lay not in contract but in *quantum meruit*. The court first decided that the plaintiff was entitled to recover the "value" of his services, even though those services were of no "value" to the defendant, since he never used the plans and sketches. In other words, the plaintiff, to recover in *quantum meruit*, is not required to show that the defendant benefited from his services but merely that he rendered such services under the reasonable assumption that he would be paid therefor.

The next issue in *Barnes, supra,* was—How should the value of plaintiff's services be measured? The court held that the percentage method was the proper measure but, in doing so, it noted that: (1) There was a contract between the parties (unenforceable as such) which provided for compensation to the plaintiff on a percentage basis; and that (2) no evidence was introduced by the plaintiff as to what his services would be worth on an hourly basis.

The court in *Barnes* did not hold, or even imply, that the hourly method of measuring value would be improper.[4] It simply did not discuss it because no evidence

---

[4] Harper himself acknowledged that he sometimes worked not on a percentage basis but on a time and materials basis and that this too was a customary and reasonable method of measuring an architect's fee in Milwaukee.

had been produced on that method. Consequently, the proper conclusion to be drawn from *Barnes* is this: Where the parties have made a contract which is certain as to its terms, but unenforceable for other reasons, then resort to one of those terms for finding the proper measure of recovery, in an equitable action like *quantum meruit,* is proper and equitable.

Contrasted with *Barnes,* the case at bar differs in two significant respects. In this case:

(1) There is evidence on both the percentage and the hourly method of measuring the value of respondent's services; and

(2) If there is a contract at all, it is unenforceable because of indefiniteness as to the consideration agreed upon.

In *Barnes,* the parties made a contract and specified how the architect would be compensated. There was mutual and simultaneous assent between the parties as to all the fundamental terms of the contract, including the measure of the value of Barnes' services.

In the case at bar, Harper explained at a preliminary meeting that, if hired, his fee would be five percent of the total cost of construction. Much later, on July 12, Gardner called him and said words to the effect, "Come on down and get started on the job." A month later Harper tendered the AIA contract. Gardner's phone call amounts to an offer, and Harper's subsequent part performance amounts to an acceptance of the offer. But at this point there is no valid contract because the parties never agreed to what the consideration would be. It cannot be argued that the parties impliedly agreed to use Harper's initial five percent statement for the element of consideration because that would still leave the term of consideration too indefinite to be enforceable. This is so because, at the time of the phone call, no dollars and cents figure as to the total cost of construction had yet come into existence. Without such a figure, the amount

represented by five percent of the total is an unknown. It would abuse the fundamental precepts of contract interpretation to hold that Gardner bound himself and his company to pay five percent of whatever Harper should later decide would be the actual cost of the building.

Therefore, since the oral agreement never embodied the element of consideration and since the subsequent written contract was never executed by either party, it is clear that no agreement was ever reached between Harper and Jewett & Sherman Company as to what Harper's fee should be. For that same reason (the absence of consideration), there was never any enforceable contract at all reached by these parties. Therefore, we think that appellant should not be allowed to recover on a percentage basis in this case. This because, unlike *Barnes,* no figure based on such a percentage was ever agreed upon by these parties and because an alternative and equally equitable means of measuring the recovery in this case is available, whereas in *Barnes* one was not available.

### Sufficiency of the evidence.

Absent the percentage concept, we turn now to the evidence of the value of Harper's services, based on an hourly rate and determine whether or not such evidence supports the verdict returned in this case.

In review of the evidence the court looks for "any credible evidence which under any reasonable view" supports the verdict. *Hoeft v. Milwaukee & Suburban Transport Corp.* (1969), 42 Wis. 2d 699, 711, 168 N. W. 2d 134.

Harper testified that he personally spent 156 hours on the Jewett & Sherman job and that his time was worth $37.50 an hour and that this amounted to $5,850. As mentioned earlier, Harper, unlike his employees, kept no record of what hours on what days he spent on the

various projects in his office. He was accustomed to working on several projects at the same time. Harper's conclusion that he worked 156 hours on the Jewett & Sherman job was based on the appointment book and desk calendar pad which he kept during the period in question. Two months before this action was commenced, Harper's attorney called him and instructed him to prepare a list of the hours he had worked on the Jewett & Sherman project. Having kept no such records, Harper went to his appointment book and desk calendar pad for the period in question and prepared the list of hours from those sources. It is not clear exactly what information was recorded in the two sources, but, by Harper's own testimony, his *actual hours* were not reflected therein. Apparently (the process was not explained at trial) he would find a notation of a conference or other activity connected with the Jewett & Sherman project on a given day and then estimate how many hours that activity must have taken up. Harper testified that he had no independent recollection of what hours he worked on what days but that nevertheless he was sure that Exhibit 12 was an accurate reflection of the time he put in.

Exhibit 12 is a handwritten list of the days and hours Harper alleged to have worked on the project. The first two columns of Exhibit 10 are simply a typewritten reproduction of the information shown in handwriting on Exhibit 12. The additional columns on Exhibit 10 show the days and hours worked by all the other employees in Harper's office. Exhibit 11 is a handwritten list, by Harper's secretary, showing who from Jewett & Sherman Company called the Harper office, at what time and on what day, between July 12th and September 6th.

Exhibit 10 was received in evidence. Exhibits 11 and 12 were not received in evidence, but Harper testified from them, stating they accurately represented the time he put in and that they were the basis on which he calculated the reasonable value of his services.

Appellant contends that it was error to allow Harper to testify as to the facts contained in Exhibits 11 and 12. Under the doctrine of present recollection refreshed, a witness may look at a writing to refresh his memory and then testify in his own words as to the contents of the writing. Before this is allowed, however, the witness must be able to state, after looking at the writing, that he now recalls the facts therein on the basis of his own independent (although refreshed) recollection. If a witness can state that he has such an independent recollection, then he may testify to the facts in the writing and his testimony—not the writing itself—is admitted to evidence.[5]

If, on the other hand, a witness looks at a writing and it does not revive or refresh his memory to the extent that he can claim an independent recollection of the facts therein—then and only then—the writing itself and not the witness' testimony may come into evidence. This second situation (where he has no independent recall) is governed by the rule of past recollection recorded. Mallare, *Wisconsin Civil Trial Evidence, supra,* p. 83, sec. 3.23; McCormick, *supra,* p. 593, sec. 278.

In either case, no evidence (neither the witness' own testimony nor the writing itself) will be allowed unless the witness can first testify that:

(1) He knows the writing to be a true and accurate record of the facts therein; and

(2) The writing was made at a time when the facts were "fresh" in his mind.

Most authorities recognize that past recollection recorded and present recollection revived are actually separate and distinct rules. This court has never held that they are not distinct.

[5] McCormick, *Evidence* (hornbook series, 1954), pp. 15–17, sec. 9; Mallare, *Wisconsin Civil Trial Evidence,* Wisconsin Continuing Legal Education (1967), p. 84, sec. 3.24.

Applying the rule of present recollection refreshed to Harper's testimony from Exhibit 12, we conclude that it was error to allow this testimony. No proper foundation for that testimony was laid; and counsel for appellant objected on that basis. The rule requires the witness to state, before he testifies, that he has an independent recall of the facts. This is no mere formality because if he does not of his own mind and memory know the facts to which he is testifying under oath, then his testimony is incompetent. McCormick, *supra*, pp. 19 and 20, sec. 10.

The incompetence and hence the inadmissibility of this testimony is conclusively shown by Harper's own acknowledgment on cross-examination that he never kept track of his hours and could not remember what they were. Since he had no independent recall, the document itself, instead of his testimony, is what should have been put in evidence, under the corollary rule of past recollection recorded. But this too requires the laying of a foundation, and it is one which Harper would have been unable to supply, to wit: The witness must swear that he knew the facts to be accurate when he recorded them and that such recording took place when the facts were fresh in his mind.

The facts here—the list of Harper's hours—were never recorded anywhere until two months before this lawsuit was started. Harper worked these hours in July through September of 1966. It was not until August of 1967, a year later, that he wrote them down. He wasn't writing down something that was already in his mind; he was simply paging through his old appointment book, putting down an hours figure every time he came to an entry connected with the Jewett & Sherman Company job.

Admission of the Harper portion of Exhibit 10 was violative of the rule governing past recollection recorded because the facts therein were not recorded at a time when they were fresh in the author's mind.

Beyond this, however, appellant asserts an even more fundamental objection to the admission of Exhibit 10. He asserts that the Harper portion of Exhibit 10 was not the *best evidence* of the facts contained therein.

The best evidence of those facts would have been the appointment book and desk calendar pad from which the exhibit was prepared. The best evidence rule is applicable where a secondary document is introduced to prove the "terms" or "contents" of the original. Exhibit 10 here was introduced to show ultimately the value of Harper's services. His appointment book and desk pad did not show the value of his services as such. However, these original documents were more than collaterally involved. McCormick, *supra*, states the following factors are determinative of whether a document is only collaterally involved, at page 412, sec. 200:

". . . Consequently, it is clear that where the effect of a writing is summarily or generally stated by the witness, without purporting to give its contents in detail, and the terms of the writing are unlikely to be disputed, or are not the subject of any important issue in the case, then such writing is regarded as a 'collateral' one, and the witness' statement of its effect without producing the writing itself, is permissible. . . ."

In this case the terms of the writing, *i.e.*, the dates worked (if not the hours) were:

(1) Stated in detail;

(2) Hotly disputed;

(3) The critical issue in the case.

Consequently, the best evidence rule is applicable to Exhibit 10. The purpose of the rule is, quite obviously, to prevent fraud on the trier of fact. *Shellow v. Hagen* (1960), 9 Wis. 2d 506, 101 N. W. 2d 694; *Mack Trucks, Inc. v. Sunde* (1963), 19 Wis. 2d 129, 119 N. W. 2d 321. The effect of the rule is to exclude secondary evidence of the original document when the proponent is unable to

satisfactorily explain his failure to produce the original writing. Testimony by the proponent that the original has been lost or destroyed is often sufficient to allow introduction of the secondary evidence.

However,

"If the original document has been destroyed by the person who offers evidence of its contents, the evidence is not admissible unless such person, by showing that such destruction was accidental or was done in good faith, without intention to prevent its use as evidence, rebuts to the satisfaction of the trial judge, any inference of fraud." *McCormick, supra,* p. 414, sec. 201.

When a document has been lost, it is presumed destroyed. *Bruger v. Princeton & St. Marie Mut. Fire Ins. Co.* (1906), 129 Wis. 281, 109 N. W. 95. Hence the same criteria are applicable to either loss or destruction, when the document was last in the hands of the proponent.

Harper was unable to produce the appointment book and desk pad at trial. He stated that he had looked for them but that he had lost them. In this situation it is pertinent to examine the evidence to see if any inference of fraud is present and, if so, to inquire whether such inference was rebutted. First, it should be noted that Harper had these items still in his possession in August of 1967, when he prepared the list. He was obviously put on notice (by his attorney's request for a list of hours) that these items would figure significantly in his dispute with Jewett & Sherman Company. Yet, at the time of trial he did not know what had happened to them. The list shows Harper working forty-nine days during the period in question. For the first two days he lists two hours each. For each of the remaining forty-seven days he lists four hours. It is difficult to believe that on forty-seven separate occasions he worked no more than four hours, no less than four hours, but always exactly four hours. It appears that he simply put down

four hours every time he found a notation in his appointment book relating to Jewett & Sherman Company.

Moreover, he claims to have worked four hours on twenty-one of the twenty-three business days in the month of August. This is the same period when Jenstead of Jewett & Sherman Company testified that he could rarely get in touch with Harper and that his calls were almost never returned.

These facts are sufficient to raise doubts about the accuracy of Exhibit 10.

Respondent relies on *Nehrling v. Herold Co.* (1902), 112 Wis. 558, 88 N. W. 614, to justify the admission of Exhibit 10. In *Nehrling, supra,* one employee was instructed to secretly keep track of the hour at which another arrived at the office each day. The first employee made a note of the arrival time of the other on a separate slip of paper each day for about six months. He then recopied the notations from each separate slip onto a single sheet and destroyed the separate slips. At trial the single sheet was allowed in evidence under the past recollection recorded rule. The best evidence rule was never mentioned in *Nehrling* at all and, for that reason alone, it is clear that *Nehrling* is no authority whatsoever for the best evidence rule.

The document in *Nehrling* was secondary and the reason the rule was not applied is obviously shown by the facts of the case. *Nehrling* was an action in libel.

Nehrling was a public official and a newspaper had printed several charges of malfeasance of office against him. The most minor charge of all was that Nehrling did not keep proper office hours. At trial, the newspaper's defense was truth; and they tried to show his improper office hours by the single sheet on which a clerk had recorded the time of his arrival.

The best evidence rule would be applicable to the single sheet in the sense that it purported to show the contents of the original (the separate slips). But the

purpose of the sheet in this case was not to show Nehrling's exact hours in order to compute the value of his services; the purpose was to show the jury that he generally arrived at his office very late in the day. If there were some errors on the single sheet, it was of no great moment because it was the general impression conveyed by the sheet, not the exact number of hours, which was important. Thus, it is apparent that since *Nehrling* did not mention the best evidence rule and since the rule was not applicable to that case, respondent's reliance on *Nehrling* is totally misplaced.

Respondent also points to *Shellow v. Hagen, supra,* as justification for admitting Exhibit 10 in evidence. In *Shellow,* the plaintiff was allowed to prove title to real estate by a limited abstract of title called an "ownership report." This was objected to as not the best evidence. Defendant demanded that plaintiff produce the official and original documents from the register of deeds' office. The issue of ownership was only collateral to the principal point in litigation. There was no serious doubt about the plaintiff's ownership. Defendant had no evidence to the contrary, and plaintiff's proof thereof was a mere formality. Nevertheless, the plaintiff offered to produce the original documents. The trial judge ruled that it would not be necessary, under the circumstances of the case, to produce the originals. In affirming that ruling the supreme court said, at pages 515 and 516, production of the originals:

". . . would have taken up an unreasonable amount of time in an already busy court to prove a point that was not seriously in dispute. The ownership report was prepared by a qualified abstracter who testified and qualified it as being a correct report of all the conveyances and deeds affecting the plaintiffs' property. . . ."

We think that *Shellow* is easily distinguished from the case at bar.

In *Blaha v. Borgman* (1910), 142 Wis. 43, 124 N. W. 1047, this court was faced with the destruction of an original document, and the court allowed secondary evidence of the contents of the original, noting at page 48, that when the original was destroyed "there was no suggestion of probability that its preservation would ever become important."

In this case, Harper had more than a suggestion that these documents might be important, since a dispute as to the value of his services had already arisen at the time he prepared Exhibit 10 from these documents; and the appellant had already refused to pay his first bill based on the percentage method. Under all the facts, we think the admission of the Harper portion of Exhibit 10 was erroneous.

The admission of Exhibit 10 was highly prejudicial to the appellant, because on that exhibit Harper's hours were depicted in exactly the same manner and format as the hours of all other employees listed on Exhibit 10. Thus the jury could easily have been misled into thinking that Harper's hours rested on the same foundation as all the other hours on that sheet (*i.e.*, valid daily business records).

Since the Harper portion of Exhibit 10 was erroneously admitted into evidence, there is no evidence of any kind in the record which would support an award for Harper's services.

The amount of work Harper performed and therefore the compensation to which he is entitled must rest on a foundation of rational and credible evidence, not speculation and guesswork.

We conclude that in the absence of the Harper portion of Exhibit 10, the evidence does not support the verdict. Consequently, the amount of the verdict must be reduced by the sum of $5,850. This amount was submitted by Harper as the reasonable value of his services based on an hourly rate times 2.5, the overhead factor.

*Sufficiency of the evidence for Kirsch's services.*

In addition to the Harper award, the appellant also challenges the amount claimed to represent the reasonable value of the services of Richard Kirsch, one of Harper's employees during the period in question. Kirsch was a Marquette University engineering student employed for the summer in Harper's office. After the July 12th phone call from Mr. Gardner, Harper sent Kirsch to the Jewett & Sherman Company offices; and Kirsch did most of his work right at the Jewett & Sherman Company plant. There is no question about Kirsch's actual hours. He worked a total of 160.5 hours, and Harper said his hourly rate was $5.

Five times the 2.5 overhead factor results in $12.50 an hour. $12.50 times 160.5 hours is $2,006.25. That is the amount Harper claimed at trial that he was entitled to for Kirsch's services. However, Harper made an agreement with Jewett & Sherman to bill them for Kirsch's services at a flat $3 an hour. When Kirsch returned to school, Harper sent Jewett & Sherman a bill in the sum of $480. Jewett & Sherman drafted and mailed a check for that amount. Harper testified he never received that check. Jewett & Sherman Company's records show that the check had never been cashed up until the time of trial.

Harper testified that he agreed to the $3 an hour proposition on Kirsch's services. On cross-examination Harper stated that he could not remember what he actually paid Kirsch that summer, but he did admit that it was less than $5 per hour. Respondent never rendered appellant an adjusted statement for Kirsch's services after the original bill of $480.

We think respondent is bound by the agreement of $3 per hour and his billing for Kirsch's services in the sum of $480.

We conclude that in this case the proper measure of recovery was the hourly method of measuring value of

services, that respondent can collect nothing for Harper's individual services because of failure of proof, that respondent is entitled to $480, not $2,006.25, for the drafting services of Richard Kirsch.

The respondent's total demand and proof submitted for architectural services was $10,965.63. The elimination of the claimed value of $5,850 of Harper's individual services and the reduction of the value of Richard Kirsch's services to $480 results in a recovery of $3,589.38 for architectural services. Accordingly, under the evidence and the law, that portion of the verdict awarding architectural services in the sum of $14,141 must be reduced to $3,589.38. This sum, added to the damages awarded for other services, results in a total verdict of $8,896.88.

The cause is remanded with directions to enter judgment on the verdict as amended, together with interest and costs.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings consistent with the directions in the opinion. Appellant allowed costs on this appeal.