STATE, Respondent, v. WIND, Appellant.

*No. State 53. Submitted under sec. (Rule) 251.54 June 7, 1973.—*
*Decided June 29, 1973.*
(Also reported in 208 N. W. 2d 357.)

For the appellant the cause was submitted on the brief of *Shellow & Shellow, James M. Shellow* and *Stephen M. Glynn,* attorneys, all of Milwaukee, and *Percy L. Julian, Jr.,* of counsel, of Madison.

For the respondent the cause was submitted on the brief of *Robert W. Warren,* attorney general, and *Michael R. Klos,* assistant attorney general.

HALLOWS, C. J.   In his first assignment of error, Wind claims the substance sold was not proved beyond a reasonable doubt to be marijuana within the meaning of sec. 161.275 (1), Stats. 1967.[1]  This argument is based on two propositions: (1) That the tests performed did not distinguish between *Cannabis sativa L.* and *Cannabis indica,* and (2) the tests were not sufficiently specific for marijuana.

The argument based on two alleged species of marijuana results from varying references to *"Cannabis"* under ch. 161, entitled "Narcotics," and chapter 151, entitled "Pharmacy."  In 1967, sec. 161.01 (13), Stats., defined *"Cannabis"* as "all parts of the plant *Cannabis sativa L."*  Sec. 151.10 (1), Stats. 1967, classified *"Cannabis indica"* as a "poison."[2]  It is thus contended that because the legislature referred to both *"Cannabis sativa L."* and *"Cannabis indica,"* there are two species of marijuana, only one of which is a narcotic. We find no merit in this argument, as there is no essential difference between *Cannabis sativa L.* and *Cannabis indica.*  The experts for the prosecution and the state testified it is generally now believed both designations refer to the

---

[1] "161.275 **Marijuana, possession and use; evidence; penalties.** (1) It is unlawful for any person to grow, cultivate, mix, compound, have control of, prepare, possess, prescribe, sell, give away, administer or dispense marijuana or hemp or the leaves or seeds thereof, or any infusion of marijuana or hemp, or of its leaves or seeds, for beverage or smoking purposes. Any person violating this subsection shall be punished as provided in s. 161.28 (1)."

[2] *"Cannabis indica"* has since been removed from the poison classification. Laws of 1969, ch. 384, sec. 3, effective February 20, 1970. The section was renumbered to sec. 450.08, Stats., by the Laws of 1969, ch. 336, sec. 104.

same thing. We note that defense counsel may be of the same opinion despite the view expressed in the brief. *See* Shellow, *The Expert Witness in Narcotics Cases,* 2 Contemporary Drug Problems 81, 96 (1973), in which it is stated, "Courts have generally concluded that Cannabis sativa L. is the only species" and that in the United States marijuana is referred to as *Cannabis sativa L.,* whereas in other countries it is referred to as *Cannabis indica. Id.* at page 95.

It is quite true that the tests used by Mr. Michael Rehburg, a chemist and witness for the prosecution, were not specific for marijuana. It was testified that in the evening of February 14, 1969, Thomas G. Ebert, a Madison police officer, went with another individual to the apartment of Jay Jacob Wind. He asked Wind if he would sell him some marijuana. Wind asked Ebert if he was a narcotics agent and Ebert replied "yes." In spite of this answer, Wind stated he would sell some marijuana. He went over to a dresser and pointed to 10 or 11 small plastic bags containing a vegetable-like material. On the dresser were pipes and other paraphernalia. Wind told Ebert to take his pick. Ebert withdrew two packs and paid Wind the agreed price of $22. The next day Ebert turned the material over to Detective James McFarlane and made a criminal-offense report. The material was then turned over to the state crime laboratory for testing. Rehburg, a chemist at the state crime laboratory, testified that he visually and microscopically examined the material sold by Wind, performed a Duquenois-Levine Test,[3] and utilized thin-layer chro-

---

[3] The Duquenois-Levine Test is a color chemical test in which the suspected material is placed in a test tube. A reagent is added, the tube is shaken, and hydrochloric acid is then added. The tube is again shaken and, if color forms, chloroform is added and the tube is again shaken. According to Mr. Rehburg, if chloroform is extracted into the lower level and the color is violet to blue, the test is positive for marijuana.

matography.[4] Based on these tests, he was of the opinion the material involved was marijuana (*Cannabis sativa L.*) and it was in condition for smoking or beverage purposes. He admitted, however, the tests he performed were merely functional group tests and could not distinguish between *Cannabis indica* and *Cannabis sativa L.;* but more important, that neither of these tests was specific for marijuana. Rehburg stated he performed no original research in the area and that he relied upon an article by Butler, a chemist, entitled "The Duquenois-Levine Test for Marijuana" and a letter written by John Thornton, a criminologist, outlining his method of thin-layer chromatography. It is without dispute in this record that functional group tests used by Rehburg separate out compounds that belong to a homologous series but are not exclusive or specific for marijuana. *See also: ALI-ABA Course of Study on Defense of Drug Cases* (1970) and in particular the following articles therein which warn that chromatography and the Duquenois Test are not specific for marijuana: Oteri, *Examination of Laboratory Experts* 242; Sullivan, *Police Laboratory Testing Procedures* 102; Jatlow, *Identification and Analysis of Drugs* 90 (Mr. Jatlow, however, believes that the Duquenois Test can be confirmed with thin-layer chromatography).

---

[4] Thin-layer chromatography is a method of separating a mixture out into its component parts, which migrate to different distances on a plate. From the migration distances, the analyst gets an idea of what compound is involved. Under the method used by Mr. Rehburg, a thin layer of fine sand is placed on a glass sheet and a drop of vegetable extract is placed along the edge of the plate. The plate is then immersed in benzine, which creeps up the thin layer. The plate is removed and dried. It is then sprayed with reagents to form color spots. According to Mr. Rehburg, after the first reagent is added, marijuana forms orange and salmon spots; after the second reagent, the spots change to purple.

The issue raised is whether the chemist's testimony of the results of the two tests used is admissible, although not specific for marijuana; we think it is. The state relies on language in *State v. Midell* (1968), 39 Wis. 2d 733, 740, 159 N. W. 2d 614, to the effect that such tests are sufficient where there is "no evidence that the weed was anything other than marijuana." This view is a misreading of *Midell*. We did not hold in that case that any evidence was sufficient to prove a substance was marijuana in the absence of evidence on the part of the defense that it was something else. The prosecution has the burden of proving beyond a reasonable doubt the substance is marijuana. However, we do not believe that the test need be specific for marijuana in order to be probative. An expert opinion that the substance is probably marijuana even if the test used is not exclusive is probative and admissible, but standing alone is not sufficient to meet the burden of proving the identity of the substance beyond a reasonable doubt. If this were a possession case, the tests would be insufficient. But here, we have other facts which particularize and support the opinion of the expert: namely, the police officer asked for marijuana, and Wind agreed to sell marijuana and charged a price which would indicate it was marijuana. These facts are sufficient with the expert opinion to meet the standard of sufficiency under the "beyond a reasonable doubt" test.

It is argued that the answers given by the chemist were not to the required degree of scientific certainty. During the state's case in chief, the chemist was asked whether as a result of placing the substance through the Duquenois-Levine Test he had an opinion as to what the material was. He was also asked whether he had an opinion as to the nature of the substance based on the results of the thin-layer chromatography test. These questions were objected to "as to form;" the objections

were overruled and the court stated it did not know what the objections meant. Defense counsel did not particularize his objections but merely reiterated them. When the chemist was asked whether he had an opinion as to whether the material was suitable for smoking, defense counsel objected on the ground of incompetency; this objection was overruled. We think the ruling of the trial court was correct.

An objection that an expert's testimony is not given to the required degree of certitude must be made at the trial or it is waived. *Roberts v. State* (1969), 41 Wis. 2d 537, 164 N. W. 2d 525. In addition, the objection must be made on proper ground. *State v. Harling* (1969), 44 Wis. 2d 266, 170 N. W. 2d 720. The objection on the ground of competency seems to have been based on the two previous objections. It did not reach the error urged. Merely objecting on the ground of incompetency is too broad and too general a ground, under the facts of this case at least, to reach the defect complained of. *See Lyon v. Grand Rapids* (1904), 121 Wis. 609, 99 N. W. 311. Normally an objection to the form of a question would be sufficient to reach the lack of certitude in a medical or scientific opinion. *See State v. Harling, supra.* However, the purpose of an objection is to apprise the trial court of the alleged error and allow opportunity for correction. *See Lyon v. Grand Rapids, supra.* Here, defense counsel had an opportunity, and it was his duty to particularize his objection when the trial court said it did not understand it. Counsel, under such circumstances, cannot remain silent and vague, in the expectation of later relying upon the lower court's ruling as a ground for reversal on appeal.

However, it is not necessary in asking a question which calls for a scientific or medical answer to use the phrase "to a reasonable degree of scientific or medical certainty." That form of question is preferable but not required.

*See State v. Muhammad* (1968), 41 Wis. 2d 12, 24, 162 N. W. 2d 567. Any use of words or phrases which indicate the proper test of certitude is sufficient. It is the substance of the inquiry seeking a proper answer which is important, not the form of the question. *See Unruh v. Industrial Comm.* (1959), 8 Wis. 2d 394, 99 N. W. 2d 182; *see also: Pucci v. Rausch* (1971), 51 Wis. 2d 513, 187 N. W. 2d 138; *Hintz v. Mielke* (1961), 15 Wis. 2d 258, 112 N. W. 2d 720; *Hallum v. Omro* (1904), 122 Wis. 337, 99 N. W. 1051. In this case the chemist was asked whether based on his tests he had an opinion that the material was marijuana. Since we have held that these tests are probative, the question to the extent that the tests are probative is proper and meets the test of certitude. The test for marijuana need not be specific or exclusive to meet a scientific test of certitude. The test of certitude goes to the validity of the tests as being scientific or being generally accepted in a scientific or medical world, not whether the results of the test prove something beyond a reasonable doubt.

It is also argued the testimony of Mr. Rehburg should be disregarded because it is hearsay and the records of his tests, rather than his testimony, should have been introduced in evidence. This argument raises the question of the distinction between present recollection refreshed and past recollection recorded. This distinction has been explained recently in *Harper, Drake & Asso. v. Jewett & Sherman Co.* (1971), 49 Wis. 2d 330, 182 N. W. 2d 551. If a witness can look at a writing which refreshes his memory as to the facts and he can then testify from his independent recollection, his testimony and not the writing is admitted in evidence, as present recollection refreshed. On the other hand, if a witness looks at a writing and it does not refresh his memory to the extent that he can form an independent recollection but he can testify that he knew the facts to be

accurate when he recorded them and such recording took place when the facts were fresh in his mind, then under the doctrine of past recollection recorded, the document itself is admitted into evidence as an exception to the hearsay rule. *See* McCormick, *Evidence,* p. 15, sec. 9 (1972) ; Wisconsin Rules of Evidence, sec. 908.03 (5), 59 Wis. 2d Rp. 250. The record plainly shows the chemist was testifying from a refreshed memory and there was no error in admitting his testimony.

Lastly, it is claimed the proof is insufficient that the marijuana which was sold to Officer Ebert was sold for smoking purposes. It may be true the proof leaves something to be desired in that although he made no mention of smoking in his criminal offense report, he testified that after purchasing the marijuana Wind rolled a cigarette out of the same material and Ebert, Wind, and another person smoked it. Ebert testified he had mentioned this incident to Officer McFarlane, but Officer McFarlane testified he first learned of the smoking the morning of the trial and did not recall Ebert's prior reference to it. At the preliminary examination, Ebert made no mention of smoking marijuana in Wind's apartment. The only explanation given by Ebert was that he forgot about the smoking incident but he admitted that one and one-half hours before the trial the district attorney told him it would be necessary to introduce evidence that the marijuana was for smoking purposes.

Failure of Ebert to mention the smoking prior to the trial goes to his credibility. *Bowers v. State* (1972), 53 Wis. 2d 441, 192 N. W. 2d 861. The determination of credibility, of course, is for the trial court, and this court can only reverse on such a ground if it can conclude as a matter of law that no finder of fact could believe the testimony. *See State v. Hunt* (1972), 53 Wis. 2d 734, 193 N. W. 2d 858; *State v. Zdiarstek* (1972), 53

Wis. 2d 776, 193 N. W. 2d 833; *State v. McCarter* (1967), 36 Wis. 2d 608, 153 N. W. 2d 527. We can make no such conclusion in this case.

Besides the testimony of Ebert, there are other circumstances surrounding the sale of the marijuana from which an inference could be reasonably drawn that the sale was for smoking purposes. *See Bowers v. State, supra; State v. Greene* (1968), 40 Wis. 2d 88, 161 N. W. 2d 239. First, marijuana is normally sold for smoking purposes. On the bureau in Wind's apartment with the 10 or 11 bags of marijuana were pipes for smoking and other paraphernalia. We see no merit in the argument that Wind merely sold the marijuana to Ebert believing he was a narcotics agent so that he could cooperate with the law. From the facts, it is clear Wind, who smiled at Ebert's claim of being an agent, did not believe Ebert was a police officer. But the fact that Wind did ask Ebert if he was a narcotics agent is some indication of his intent to sell for illegal purposes, *i.e.,* smoking. We think the evidence is sufficient to sustain the conviction.

*By the Court.*—Judgment and order affirmed.