DREXLER, Respondent, v. ALL AMERICAN LIFE & CASUALTY COMPANY, Appellant.

*No. 791 (1974). Argued April 8, 1976.—Decided May 4, 1976.*
(Also reported in 241 N. W. 2d 401.)

For the appellant there was a brief by *Douglas J. Klingberg* and *Terwilliger, Wakeen, Piehler, Conway & Rouse, S. C.* of Wausau, and oral argument by *Douglas J. Klingberg*.

For the respondent there was a brief by *Schmitt, Nolan & Hansen* of Merrill, and oral argument by *Leonard F. Schmitt*.

BEILFUSS, J.   The parties agree the sole issue is whether there was sufficient credible evidence to sustain the jury finding of total disability for the period of time in question. We are of the opinion the evidence was sufficient and that the judgment should be affirmed.

Before we discuss the evidence it should be pointed out that the plaintiff's claim was limited to total disability, as defined in the policy, from the date of the injury to the day of trial. No claim was made based upon future or permanent disability.

At the time of the trial the plaintiff was fifty years old, was married and had five children, two of whom were still living at home. The plaintiff graduated from high school and farmed for two years. He then went into the logging and pulping business which he pursued until the accident which gave rise to the disability complained of. He continued to farm while logging and, during slack periods in the logging business, did construction work. The plaintiff had never worked at a job which did not require physical labor.

The plaintiff owned and operated a machine, called an "iron mule," to skid logs from the cutting area to a landing where they could be loaded onto trucks. The machine was equipped with four-wheel drive and a hydraulic clamp which was used to pick the logs up off the ground and load them onto the back of the machine. The clamp was operated by the use of levers located behind the driver's seat. After positioning the machine near the logs to be loaded, the operator was required to swing over the seat and into a standing position to manipulate the levers. At times, when a log was encountered which was too large for the clamp to handle, the plaintiff would get down from the machine and, using a pry pole, attach a chain from the machine to the log and drag it to the landing. Depending on the distance, he would make ten to fifteen trips each day over rough logging roads from the cutting area to the landing.

The accident giving rise to the alleged disability occurred on October 22, 1971. On that occasion plaintiff was not operating his iron mule, but a four-wheel drive Scout which was forced off the road and onto some large rocks. In the rear of the vehicle were several diesel fuel cans, at least one of which was full, other gasoline cans, tools and spare parts for the skidding machine. These items came forward upon impact with the rocks, striking him and rendering him unconscious. When the plaintiff regained consciousness his face was bloodied and his head, neck, back and both shoulders and knees hurt. He was hospitalized for nine days, receiving medication for pain and therapy for his right knee. While in the hospital the plaintiff was treated by his personal physician, Dr. Bernard W. Beattie.

Following his release from the hospital the plaintiff continued to receive medication for pain and saw Dr. Beattie on a regular basis. The plaintiff testified that the pain continued at the time of the trial. He could

not reach behind his back with his right hand or raise his right arm above shoulder level because of the pain in his right shoulder. His right knee gave out if he stood for any length of time. The plaintiff also testified that he suffered back pain following physical exertion and could not sit or stand for sustained periods of time. He continued to take medication for pain and to help him sleep. The plaintiff's pharmacist testified that he had filled several prescriptions for such medication from Dr. Beattie. A prescription for 30 sleeping capsules was issued on November 15, 1971 and refilled on February 9, 1972, June 23, 1972, December 6, 1972, June 4, 1973, and May 3, 1974. A medication for dizziness was prescribed on November 29, 1971. In addition, two different pain medications were prescribed. The first was issued on February 9, 1972. The second, originally issued on June 23, 1972, was refilled on November 16, 1973.

The plaintiff attempted to operate his skidding machine every two or three weeks after his release from the hospital but was unable to do so. He testified that the primary difficulty was with his right knee. When he tried to rise from the seat and turn into a standing position to operate the clamp, his knee would sting and get weak. Once in the standing position the plaintiff had no difficulty operating the levers, but he could not sit or stand for long periods because of pain in his neck, back, right shoulder and right knee. The plaintiff became convinced that he could not continue with the skidding occupation and he finally sold the machine. He did not operate the machine for profit after the accident and sought no other employment. The plaintiff testified that he did not feel he could perform any work requiring a fixed time schedule or involving sitting or standing in one position for any length of time.

The plaintiff also testified the pain curtailed his performance of domestic chores and his enjoyment of recreational activities. He stated that he could not

mow his 100 x 120 foot yard all at one time and required assistance from his wife and daughter. He purchased a snowblower with an electric starter because he had difficulty starting motors. The plaintiff did put in a small garden lot one summer with the use of a shovel and rake, but it took him three weeks to do so. He drove his automobile 130–140 miles on one occasion but his wife normally performed the driving chores when he did not feel up to it.

The plaintiff went fishing, both still fishing and fly casting, two or three times a week after the accident. Although he once sat in a boat for eight hours, he usually could do so for only two to three hours at a time. He tried to row but did so slowly. The plaintiff also went ice fishing on a couple of occasions. He stated he usually looked for a hole already drilled by someone else. If the hole had frozen over, however, he used an ice chisel to reopen it. The plaintiff also went deer hunting in the fall. However, his hunting activities were limited to "standing" and he did not participate in the "driving" process. On one occasion the plaintiff shot a deer when he was about one-half mile into the woods; however, he required assistance to drag the deer out. He went rabbit hunting on one occasion but testified that his knee gave out.

The plaintiff had suffered a back injury in a fall in 1969 prior to the accident here involved. However, he was told by Dr. Beattie that the injury suffered in that fall had healed and he felt that the pain in his back at the time of the trial was the result of the later accident. The prior injury was described in detail on the plaintiff's application for the disability policy and a rider had been attached to the policy by the defendant providing that no coverage was afforded for loss caused by or contributed to by any injury to or disorder of the thoracic spine.

Dr. Beattie testified on behalf of the plaintiff. He stated that the plaintiff was brought to the hospital emergency room following the October 22d accident with lacerations on his forehead, abrasions and contusions to both shoulders and right knee and multiple abrasions over a wide area of the back. He complained of pain in the right knee, both shoulders and head. No broken bones were discovered and the hospital treatment consisted primarily of medication for pain and physical therapy.

Following his discharge from the hospital, Dr. Beattie saw the plaintiff on several occasions in his office. On November 5, 1971, the plaintiff complained of continuing pain and stated that the physical therapy did not seem to do much good. On November 29, 1971, the plaintiff reiterated his complaints of pain in the shoulders and right knee and stated he had fallen. He also complained of headaches and dizziness. Similar complaints of pain were made on December 14 and 27, 1971, and January 11, 1972. On the latter date, Dr. Beattie gave the plaintiff an injection of Depomederol, a cortisone preparation, to decrease inflammatory changes. However, on January 26th, the plaintiff stated he had received no relief from that injection. On February 9, 1972, there was no change in the plaintiff's condition so Dr. Beattie referred him to a Dr. Brown. Dr. Brown gave the plaintiff an injection in the right shoulder of a sylocaine-cortisone solution which was to eliminate pain and reduce inflammation. The plaintiff, however, stated that the injection only caused him a great deal of pain.

Dr. Beattie testified that, in his opinion, the accident caused the plaintiff's condition at the time of trial. He stated that he could find no objective symptoms to support the plaintiff's continued complaints of pain. The only objective injuries he had observed were the contusions and abrasions immediately following the accident. Dr. Beattie stated that the motion in the plain-

tiff's right shoulder was limited by pain and that he suspected but had not diagnosed a "rotator cuff syndrome." He testified that the only measure of pain is what the patient says and that he accepted the plaintiff's complaints of pain as real. In Dr. Beattie's opinion, the plaintiff was unable to carry on his logging occupation or to perform any other sustained physical labor involving a fixed time schedule or lifting of appreciable weights.

On cross-examination Dr. Beattie testified he had submitted a report to the defendant on January 13, 1973, which stated that the right knee and shoulder were stiff and painful but that the condition "should improve gradually." Dr. Beattie stated he had made no definitive diagnosis other than the one relating to the initial contusions and abrasions because there was "[n]o definite medical explanation for his complaints." However, Dr. Beattie reaffirmed his testimony that, in his opinion, the plaintiff could not perform heavy physical labor. He agreed that motivation and desire to recover were important factors in a patient's recovery and stated that he was familiar with cases where complaints and subjective symptoms were prolonged to avoid returning to work.

Dr. Irving Shiek, a physician and surgeon, also testified for the plaintiff. He first saw the plaintiff at counsel's request on December 15, 1972. After obtaining the patient's history, Dr. Shiek performed his own examination. Dr. Shiek stated that the plaintiff complained of tenderness over the right shoulder and pain when the right arm was abducted or raised to shoulder level. The plaintiff could not get his right arm behind his back. There was also tenderness over both knees but more marked in the right knee and pain in the lumbar spine and muscles of the lower back. Dr. Shiek saw the plaintiff again in June 1974, just prior to trial and discovered

essentially the same conditions. It was Dr. Shiek's opinion that the accident caused the plaintiff's complaints of pain on both occasions. He could find no objective symptoms to support those complaints. However, he did not believe the plaintiff was lying and he believed the plaintiff did have the pain he described. He further stated he believed the plaintiff could not perform heavy physical labor, lift appreciable weights, or carry on any work involving continuous effort or requiring sitting or standing for sustained periods of time.

The defendant also called two medical witnesses to testify in its behalf. Dr. Donald H. Kranendonk, an orthopedic surgeon, and Dr. Roy Larson, a physician and surgeon. Both doctors took the plaintiff's medical history and examined him to determine the extent of physical disabilities. Neither found any objective symptoms which would account for his pain and resulting disability. In fact, some of the tests performed could indicate that the plaintiff did not have the pain and physical limitations he claimed he had. However, both doctors conceded in substance that if he in fact had the pain he complained of he could not do the physical work he had been doing prior to the accident.

It is the defendant's position that where, as here, there are no observable physical defects, a finding of total disability must be based on competent expert medical testimony. The medical opinions as to disability in this case are incompetent, the defendant contends, because they are based upon the plaintiff's subjective complaints of pain rather than upon objective medical findings. As such, the opinions are argued to be nothing more than baseless conjecture and speculation.

As the defendant points out, the plaintiff's disability claim is not based upon any readily observable physical defect or injury, such as the loss or impairment of a body member. Rather, the plaintiff's complaints are

of pain and weakness which, he has alleged, precluded him from continuing to carry on his normal logging occupation or any other gainful occupation for which he is suited by training or experience. The defendant's basic contention is that expert medical testimony revealing objective physical symptoms is necessary to support a verdict of total disability under these circumstances.

In general, expert testimony is not required to support a jury's finding of fact unless the subject matter involved is outside the realm of the ordinary experience of mankind and requires special learning, study and experience.[1] It is clear from the cases in this state that when a verdict is dependent upon current or past complaints of pain, expert medical testimony is not essential to support a finding that the pain, in fact, exists. The jury is entitled to believe the claimant even where there is no readily observable "objective" symptom which might account for the pain.[2]

The defendant relies upon a line of cases which hold that where recovery is sought for future pain or permanent injury and the injury is "subjective" in character and of such a nature that a layman cannot with reasonable certainty know whether or not there will be future pain and suffering, competent expert opinion testimony is required to establish the permanency of the injury or the likelihood that the pain will continue for a period of time in the future.[3] Here there is no issue as to future

[1] *See: Netzel v. State Sand & Gravel Co.* (1971), 51 Wis. 2d 1, 186 N. W. 2d 258; *Cramer v. Theda Clark Memorial Hospital* (1969), 45 Wis. 2d 147, 150, 172 N. W. 2d 427; *Pollock v. Pollock* (1956), 273 Wis. 233, 246, 77 N. W. 2d 485.

[2] *See: Sennott v. Seeber* (1959), 6 Wis. 2d 590, 95 N. W. 2d 269; *Bethke v. Duwe* (1950), 256 Wis. 378, 383, 41 N. W. 2d 277; *Ballard v. Lumbermens Mut. Casualty Co.* (1967), 33 Wis. 2d 601, 610, 148 N. W. 2d 65.

[3] *See: Diemel v. Weirich* (1953), 264 Wis. 265, 58 N. W. 2d 651; *Peterson v. Western Casualty & Surety Co.* (1958), 5 Wis. 2d 535, 540, 93 N. W. 2d 433.

pain or permanency of injury. Although the policy in question provides for total disability benefits to be paid for the lifetime of the insured while disabled, the plaintiff in this action sought and recovered only those benefits payable up to and through the time of trial. The cases relied upon by the defendant are inapposite.

The resolution of this appeal does not hinge solely upon the validity of the medical opinions as to disability. The question is simply whether there is any credible evidence which under any reasonable view supports the jury's verdict. *Lemke v. Guse* (1965), 26 Wis. 2d 80, 131 N. W. 2d 893; *Fields v. Creek* (1963), 21 Wis. 2d 562, 124 N. W. 2d 599; *Schafer v. Time Ins. Co.* (1966), 32 Wis. 2d 694, 146 N. W. 2d 413. This court, in construing similar policy provisions, has held that "total disability" does not mean a state of absolute helplessness. All it requires is that the insured be incapable of doing all the substantial and material acts necessary to the prosecution of the insured's regular business or any business for which he is reasonably fitted by education, training and experience.[4]

Whether the plaintiff was truthful with respect to his complaints of pain and his consequent inability to pursue his regular occupation or any other occupation requiring physical labor is, of course, a matter for the jury.[5] The medical testimony is relevant insofar as it tends to support or defeat the plaintiff's claims. The plaintiff's testimony as to the existence of pain and his inability to engage in certain physical activities is set forth above. All of the doctors agreed that if the pain was real the plaintiff could not perform the type of physical labor which he had performed prior to the October 1971 accident.

[4] *See: Harker v. Paul Revere Life Ins. Co.* (1965), 28 Wis. 2d 537, 546, 137 N. W. 2d 395.

[5] *Ritter v. Coca-Cola Co.* (1964), 24 Wis. 2d 157, 128 N. W. 2d 439.

The medical witnesses who testified on behalf of the plaintiff stated that they believed he was telling the truth as to his complaints of pain. The defendant argues that because there was no objective foundation for the pain the witnesses did not "execute the function of an expert witness by merely lending credence to the plaintiff's complaints" and were, in essence, "expressing their own personal belief in the veracity of their patient's conclusion that he was not able to work."

While expert testimony is not essential to support a finding that an individual suffers pain, the rule is that a medical expert may express an opinion as to whether the pain of one he has attended or examined is real, imaginary or feigned. This rule was recognized and applied by this court in the early case of *Quaife v. Chicago & Northwestern Ry. Co.* (1880), 48 Wis. 513, 4 N. W. 658.

In *Quaife* the defendant claimed at the trial of a personal injury action that the plaintiff was not injured to the extent claimed and that she was, in fact, feigning sickness, lameness and debility for the purpose of enhancing her damages. To resolve the validity of her claims, the plaintiff submitted to an examination by six physicians, three of whom were selected by her and three by the defendant. All testified that they could find nothing in the plaintiff's physical appearance which supported her claims of pain. On appeal from a judgment for the plaintiff the defendant claimed that the trial judge erred in allowing one of the doctors to state his opinion that the plaintiff actually suffered the pain complained of. The court summarized the defendant's arguments at page 522:

"It is very earnestly insisted by the learned counsel for the appellant, that upon this evidence the questions were improper, for the reason that it was in effect asking the witness whether he believed the statement of the plaintiff *Mrs. Quaife,* made at the time of the exam-

ination and as a witness on the trial, that she suffered pain. It is argued that as the witness had sworn that he could find nothing in her physical condition that indicated the existence of pain, or which suggested the possibility of such pain, his answer must necessarily be based upon what she said alone; and that if based on that alone, it could only be an opinion of the witness as to the veracity of the plaintiff."

The court then concluded at page 523:

". . . In this case the patient complained of pain in the hip and lameness of the limb as amongst her troubles. The experts examine the limb and hip, and find no such appearance as would indicate lameness or pain. Yet the patient insists upon the fact of lameness and pain. It becomes then a question with the experienced physician, whether such pains and lameness are imaginary, feigned or real; and, to determine this, he must resort to other evidences than those to be derived from an examination of the limb itself. And in such case we think it is clearly competent for the expert to give an opinion from the general appearance, actions and looks of the patient, and what she says at the time in regard to her condition."[6]

The defendant nevertheless argues that expert opinions based solely upon the patient's subjective complaints of pain have no probative value and, therefore, cannot be relied upon to support the jury's verdict. This court has held that medical opinions based upon subjective statements of the patient are inadmissible unless those statements were made for the purpose of procuring treatment and not solely for the purpose of having the physician testify.[7] This rule, of course, is a recognition of the self-serving nature of the patient's statements;

[6] *See:* 31 Am. Jur. 2d, *Expert and Opinion Evidence*, p. 659, sec. 118; Annot., *Admissibility, in civil cases, of expert evidence as to existence or nonexistence, or severity, of pain*, 11 A. L. R. 3d 1249, 1263.

[7] *See: Ritter v. Coca-Cola Co., supra; Schields v. Fredrick* (1939), 232 Wis. 595, 598, 288 N. W. 241.

the exception being based upon the presumption that a truthful account of injuries will be given when treatment is actually sought. Here no objection was made to the admissibility of any of the medical testimony. It is clear that once opinion evidence based upon subjective complaints is admitted without objection, it may be considered by the jury in making its findings.[8]

The defendant also argues that even if subjective complaints of pain constitute a sufficient basis for an expert opinion on disability, the opinions in this case are incompetent because not given to a "reasonable medical certainty." A medical opinion is not admissible if it is based upon speculation or conjecture. *See: Puhl v. Milwaukee Automobile Ins. Co.* (1959), 8 Wis. 2d 343, 99 N. W. 2d 163; *Creamery Package Mfg. Co. v. Industrial Comm.* (1933), 211 Wis. 326, 248 N. W. 140. Again, however, the defendant concedes that it made no objection to the admissibility of the opinion testimony on this ground. This court has stated that "[a]n objection that an expert's testimony is not given to the required degree of certitude must be made at the trial or it is waived."[9]

In any event, it is clear that the opinions in this case satisfy the certainty requirements. No particular words of art are necessary to express the degree of medical certainty required to remove an expert opinion from the realm of mere possibility or conjecture. The test to be applied is whether a reasonable interpretation of the expert's words demonstrate that he was expressing his expert medical opinion.[10] This court has held ex-

[8] *See: Powers v. Allstate Ins. Co.* (1960), 10 Wis. 2d 78, 85, 102 N. W. 2d 393; *Plesko v. Milwaukee* (1963), 19 Wis. 2d 210, 219, 120 N. W. 2d 130.

[9] *State v. Wind* (1973), 60 Wis. 2d 267, 273, 208 N. W. 2d 357; *Roberts v. State* (1969), 41 Wis. 2d 537, 164 N. W. 2d 525.

[10] *See: Unruh v. Industrial Comm.* (1959), 8 Wis. 2d 394, 402, 99 N. W. 2d 182; *Powers v. Allstate Ins. Co., supra.*

pressions such as "I felt," "I feel," "I believe," "liable," "likely," and "probably" to be sufficient.

In response to counsel's questions concerning the plaintiff's ability to carry on his logging operation, to perform other heavy work, or to engage in work which would require sitting or standing in one position for a sustained period of time, Dr. Beattie stated: "Well, in my opinion he could not," and "I don't believe he could." In response to similar questions, Dr. Shiek also stated: "I don't believe so" or "I don't believe that he could." The witnesses have expressed their opinions to a sufficient degree of certainty.

The defendant does not seriously contend that if the plaintiff's complaints of pain are real he is not totally disabled within the terms of the policy. As noted above, all the doctors agreed that if the pain existed the plaintiff could not perform the type of work which he had pursued prior to the accident. The defendant had no training or experience in any type of work which did not require physical labor. He testified, generally, that he had pain in the right shoulder and right knee which limited his mobility and pain in the back and neck which caused considerable discomfort. While he could perform some chores requiring physical exertion, he could not sit or stand for sustained periods of time. The fact that he did engage in limited recreational activities does not render the finding of disability contrary to the evidence. As this court noted in *Harker, supra,* "total disability" under the policy does not mean absolute helplessness.

The basic issue in this case was whether the plaintiff was truthful in his complaints of pain. All of the doctors who examined him agreed that they could find no objective physical injury which would account for the pain. However, none stated with certainty that the pain did not exist or that the plaintiff was lying. The question was simply one of credibility. In a similar case, this court stated:

"It was within the province of the jury to believe this testimony. We cannot say that it was inherently incredible or was rendered incredible by other evidence. While medical witnesses testified that plaintiff's objective ailments resulting from the accident had been cleared up, the jury could reasonably believe that he had the symptoms described above. While classed as subjective, they may have been very real. Ailments of the mind and brain are real though intangible, and may cause as much suffering and disability as the so-called objective injuries that are more readily recognized, measured, and tested. To be sure, they are more easily simulated and deception may be more difficult to expose; but that does not mean that everybody asserting subjective symptoms in the absence of objective disorders must necessarily be treated as a malingerer. Here there was no medical testimony that plaintiff was faking, and sufficient medical testimony to warrant the jury in believing that plaintiff's condition was as above described and that it resulted from the injuries received in the accident." *Kincannon v. National Indemnity Co.* (1958), 5 Wis. 2d 231, 235, 236, 92 N. W. 2d 884.

Here there is competent medical testimony in addition to the plaintiff's own testimony in terms of his subjective complaints to support the jury's determination that the pain resulting from the accident prevented the plaintiff from engaging in any of the manual-labor occupations for which he was reasonably fitted by education and experience.

*By the Court.*—Judgment affirmed.