In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3883

LINDQUIST FORD, INC.,
STEVEN LINDQUIST, and
CRAIG MILLER,

*Plaintiffs-Appellees,*

*v.*

MIDDLETON MOTORS, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07-cv-12—**Barbara B. Crabb**, *Judge.*

ARGUED SEPTEMBER 28, 2010—DECIDED SEPTEMBER 13, 2011

Before EASTERBROOK, *Chief Judge*, and SYKES and TINDER, *Circuit Judges*.

SYKES, *Circuit Judge.* In this successive appeal, Middleton Motors, Inc., challenges the district court's liability and damages determinations in a second bench trial following our decision in *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469 (7th Cir. 2009) ("*Lindquist I*").

The underlying dispute involves a business deal gone awry between two midwestern car dealerships. The relationship began when Steven Lindquist and Craig Miller of Lindquist Ford, Inc.,[1] a successful Ford dealership in Iowa, offered to assist Middleton, a struggling Ford dealership near Madison, Wisconsin. The parties generally agreed that Miller, Lindquist's general manager, would provide management services to Middleton with compensation to begin after he turned Middleton profitable and also that Lindquist would provide a capital infusion in exchange for an ownership interest in Middleton. Negotiations continued after Miller started working at Middleton, but the parties never reached a more specific agreement. The relationship broke down 11 months after Miller assumed general-management responsibility at Middleton, largely because Lindquist failed to come forward with the expected cash infusion. Middleton showed Miller the door. Still not earning a profit, Middleton did not pay Lindquist for Miller's services.

Lindquist sued Middleton to recover compensation for Miller's services. After a bench trial on unjust-enrichment and quantum-meruit claims for relief, the district court entered judgment for Lindquist on both claims. Middleton appealed, and in *Lindquist I* we held that the court had misconstrued the elements of quantum

---

[1] We refer to plaintiffs Steven Lindquist, Craig Miller, and Lindquist Ford, Inc., collectively as "Lindquist" unless the context requires otherwise.

meruit under Wisconsin law, taken too narrow a view of the equitable component of unjust enrichment, and failed to consider important evidence as part of the equitable balancing required for both causes of action. We remanded for retrial. The court again entered judgment for Lindquist for nearly identical damages. Middleton appealed a second time.

We reverse. The court's factual findings were clearly erroneous. The court found that Middleton became profitable during Miller's tenure *and* that Middleton fired Miller before he had a fair opportunity to restore the dealership to profitability. Both propositions cannot be true. Apart from this internal inconsistency, the court's findings are insufficiently supported by the evidence. The court's damages determinations were also flawed for the reasons identified in *Lindquist I*.

## I. Background

The facts are described in detail in *Lindquist I*; we repeat only those necessary to the resolution of this appeal. In 2002 Lindquist and Middleton opened negotiations about how to revive Middleton's financially troubled Ford dealership. Middleton was co-owned by brothers Dave, Robert, and Dan Hudson, and they had explored relationships with other dealerships, including the Geiger Group in Elkhorn, Wisconsin. Geiger had the potential to invest money in Middleton but did not have general-management capabilities of the sort that Lindquist offered.

Negotiations became more serious in 2003. Perhaps sensing that it might take months to iron out the terms of their relationship, in March 2003 Lindquist and Middleton signed a confidentiality agreement that also contained a proviso that neither dealership would be liable to the other in the absence of an executed written agreement. On April 17, 2003, Steven Lindquist, Craig Miller, and Lindquist's accountant Carl Woodward met with Dave Hudson, Robert Hudson, and Middleton's accountant Joe Schwarz to explore an arrangement whereby Miller would provide management services to Middleton in exchange for a percentage of Middleton's net profit. The Hudson brothers emphasized early in the meeting that their dealership also needed a cash infusion, but the parties did not reach agreement on this point. They did decide, however, that Miller would immediately begin working as a general manager at Middleton and Woodward would draft a proposed management agreement. Miller took over general management of Middleton on April 21 and began implementing a long list of budget cuts. He also identified goals for each department, began weekly management meetings, and terminated several employees. Miller continued as general manager of Lindquist while also working at Middleton.

On June 2 Lindquist faxed a first draft of a proposed agreement to the Hudson brothers. The draft agreement provided that the "only compensation" for Miller's management services would be "the Fee, the use of one vehicle, and the reimbursement of travel, meals, and lodging costs," with the proposed "Fee" defined as 45% of

Middleton's net profit. Under this proposal, payment of the Fee would commence on the first day of the first month that the dealership showed a net profit. Lindquist also proposed a termination provision stating that if Middleton terminated Miller's services before January 1, 2005, Middleton would pay Lindquist the greater of $350,000 or 50% of Middleton's profits after payment of a 15% management fee and the 45% Fee. The proposal emphasized that Miller would have full authority in running Middleton's day-to-day operations. No mention was made of a capital investment.

Schwarz responded on July 1 in an email containing two attached memos (oddly dated July 2) reiterating Middleton's position that Lindquist needed to provide cash. Schwarz explained that without a capital investment,

> if . . . the changes made by [Miller] do not work, it has weakened [Middleton's] position further and [Lindquist will] have put nothing at risk. Our original understanding of a cash insertion, which is at risk, gives [Middleton] greater comfort that [Miller] is at the top of his game and is giving the priority effort we need.

In a conference call later that month, Lindquist agreed to make the cash infusion in exchange for an ownership interest in the form of stock. Schwarz agreed to draft a letter of understanding to this effect.

On August 28 Schwarz circulated a letter of understanding "for the relationship among the parties to be legally formalized at a later point." The letter provided that the parties "have agreed to enter into an agree-

ment whereby [Lindquist] would provide a cash infusion into [Middleton] and take over management of the operations for the fees discussed below." As Lindquist and Middleton had understood all along, "the fees" were to be based solely on a percentage of Middleton's profits. They included 15% of Middleton's "real income" for recoupment of time and expenses associated with the assistance provided and 22.667% of the remaining "real income" as compensation for management of Middleton's operations, with payment to begin the first month that Middleton reported a real-income profit. The letter defined "real income" by reference to Generally Accepted Accounting Principles ("GAAP") income adjusted for last-in, first-out accounting ("LIFO") and other items. The proposed capital investment from Lindquist was set at $500,000, in return for a 25% ownership interest in Middleton. The termination provision proposed in the letter of understanding differed from the one in Lindquist's June 2 proposal; it called for a termination payment based exclusively on a percentage of Middleton's net profit and omitted the January 1, 2005 date. More specifically, the termination language in the letter of understanding proposed that if Middleton terminated the parties' relationship for good cause, Lindquist would be entitled to 50% of profits for the succeeding 24 months if profits were between $500,000 to $1,000,000, and for 36 months if profits exceeded $1,000,000.

Although negotiations continued over the next several months, the parties never did reach a final written agreement. In September 2003 Miller began working a half day each week as president of yet another Ford dealer-

ship in Clinton, Iowa. Dave Hudson testified that he grew increasingly frustrated in late 2003 and early 2004 as the capital investment from Lindquist never came. On March 24, 2004, with the dealership still sustaining losses, Dave Hudson met with Miller and terminated the parties' relationship. He testified that this decision was based primarily on Lindquist's failure to provide the contemplated cash investment, but also on concerns about Miller's management decisions and the losses the dealership continued to experience.

On May 11 Miller wrote to Dave Hudson seeking compensation for his services based on an estimate of Middleton's "adjusted profit." Miller demanded $32,627.84, which was his calculation of Middleton's adjusted profit during the last six months of 2003, as well as "50% of the adjusted profits per the Letter of Understanding" for 2004 and 2005, and 50% of adjusted profits for 2006. Along with his letter, Miller enclosed a handwritten note showing Middleton's losses for the last six months of 2003 and then making certain unexplained adjustments to arrive at an "adjusted profit" of $61,272.93, which he multiplied by a "management company fee" of 53.25% to obtain the $32,627.84 figure.

Middleton refused to pay, primarily because Miller had not turned the dealership profitable. Lindquist then brought this suit for breach of contract, promissory estoppel, quantum meruit, and unjust enrichment under Wisconsin law. The district court entered summary judgment for Middleton on Lindquist's breach-of-contract and promissory-estoppel claims, and the unjust-enrich-

ment and quantum-meruit claims proceeded to a bench trial. The court found in Lindquist's favor and awarded damages in the amount of $160,000 plus prejudgment interest. On postjudgment motions, the court vacated the interest award and reduced the total judgment to $152,332 to account for a $7,668 advance Middleton had paid Lindquist in December 2003. Middleton appealed, and in *Lindquist I* we reversed and remanded with instructions to conduct a new trial applying the correct legal framework and admitting evidence of the parties' negotiations, understandings, and conduct relevant to the equitable balancing elements of unjust enrichment and quantum meruit.

Retrial before the same district judge produced a nearly identical judgment for Lindquist. On the unjust-enrichment claim, the court made several key factual findings to supports its conclusion that equity lies with Lindquist. Specifically, the court found that: (1) pursuant to the June 2 proposal, Lindquist expected that Miller would have at least until January 1, 2005, to turn the dealership around and would be entitled to compensation if Middleton terminated the relationship before then; (2) Lindquist believed it was protected by the provision in the letter of understanding that the parties' relationship could be terminated only for "good cause"; (3) with Miller in charge, Middleton posted "real income" in the second half of 2003 and first quarter of 2004; (4) Middleton terminated Miller's services prematurely, just as many of his strategies were beginning to show results; (5) Middleton failed to give Miller full control over day-to-day management of the dealership; (6) Middleton's

primary goal was not a cash infusion but management assistance; and (7) Middleton, not Lindquist, "dropped the ball" on the subject of the capital investment. *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 665 F. Supp. 2d 1009, 1019-21 (W.D. Wis. 2009) ("*Lindquist II*"). Based on these findings, the court held that Lindquist was equitably entitled to be compensated for Miller's services under quantum meruit and unjust enrichment.

Regarding damages, the court noted that although *Lindquist I* had explained the remedial difference between quantum meruit and unjust enrichment, in this case the analyses merged because "[w]hat a general manager's services are worth to a dealership is what they would cost in the marketplace." On this understanding the court evaluated Lindquist's damages based on the average pay for general managers of car dealerships in the region, arriving at a figure of $145,994.08 for 11 months plus benefits of $9,107.38, for a total of $155,101.46. To this sum the court added $6,503.53 to account for the amount Lindquist spent installing a fiber optic T-1 data-line computer link, then subtracted the $7,668 advance Middleton paid to Lindquist in December 2003. The court entered final judgment for Lindquist in the amount of $153,936.99.

## II. Discussion

On an appeal from a judgment entered following a bench trial, we review the district court's legal conclusions de novo, its factual findings for clear error, and its decision to grant an equitable remedy for abuse of dis-

cretion. *Lindquist I*, 557 F.3d at 475. A factual finding is clearly erroneous "'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Platinum Tech., Inc. v. Fed. Ins. Co.*, 282 F.3d 927, 931 (7th Cir. 2002) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). As in *Lindquist I*, Middleton takes issue with nearly every aspect of the retrial. Middleton claims that the district court: (1) misunderstood this court's instructions in *Lindquist I* and therefore erroneously assessed the parties' reasonable expectations; (2) erroneously credited Miller's testimony that Middleton was profitable in the second half of 2003 and first quarter of 2004; (3) erroneously found that Miller had been denied a fair opportunity to turn Middleton profitable; and (4) failed to follow this court's instructions regarding damages.

## A. Circuit Rule 36 and Automatic Reassignment on Remand for a New Trial

Before proceeding, we note that once remanded for a new trial, this case should have been assigned to a different judge under Circuit Rule 36. *See* 7TH CIR. R. 36 (A case remanded for a new trial "*shall* be reassigned by the district court for trial before a judge other than the judge who heard the prior trial." (emphasis added)). "The purpose of Rule 36 is to avoid, on retrial after reversal, any bias or mindset the judge may have developed during the first trial." *Cange v. Stotler & Co.*, 913 F.2d 1204,

1208 (7th Cir. 1990). Reassignment is the default rule when retrial is ordered and is intended to be automatic. The only exceptions are when the remand order directs that the same judge retry the case (ours did not) or the parties jointly request that the same judge retry the case. *See* 7TH CIR. R. 36.

When we brought Rule 36 to the parties' attention at oral argument, both counsel seemed surprised. They did say, however, that they never stipulated to retrial before the same judge. This case should have been reassigned for retrial. Rule 36 is intended to head off successive appeals of this very nature, in which the losing party on retrial accuses the district court of neglecting our remand instructions and conforming to its earlier view of the case.

## B. Liability Under Quantum Meruit and Unjust Enrichment

As we explained in *Lindquist I*, quantum meruit and unjust enrichment are quasi-contractual theories of relief grounded in equitable principles. The elements of unjust enrichment under Wisconsin law are: (1) a benefit conferred by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; and (3) acceptance and retention of the benefit under circumstances making it inequitable for the defendant to retain it without payment. *Seegers v. Sprague*, 236 N.W.2d 227, 230 (Wis. 1975). On the other hand, to succeed in a quantum-meruit claim, the plaintiff must prove that: (1) the defendant requested and accepted his services; and (2) the plaintiff

reasonably expected to be compensated for the services rendered. *Lindquist I*, 557 F.3d at 478. Although the quantum-meruit cause of action does not explicitly contain an equitable element, we held in *Lindquist I* that whether viewed as a part of the reasonableness requirement of the second element of the claim or as a third, separate element, equity must lie with the plaintiff before a quantum-meruit remedy may be ordered. *Id.* Both causes of action thus share a common component of equitable balancing, and in cases like this one where there is ample evidence of the parties' expectations, deciding where equity lies must account for the parties' negotiations, understandings, and course of conduct. *Id.* at 478-80.

In *Lindquist I* we significantly narrowed the number of issues the district court needed to resolve on remand. We upheld the district court's determinations with respect to the first two elements of unjust enrichment but held that the court had taken too narrow a view of the equitable aspect of the claim. By asking whether as a general matter equity permits an employer to withhold payment for 11 months of services, the district court failed to account for key evidence specific to this case that sheds light on the parties' negotiations, understandings, and expectations. We also said that the only lingering question under quantum-meruit analysis was whether the evidence would establish that Lindquist's expectation of compensation for Miller's services was equitably reasonable. We then provided a clear instruction to guide the analysis on remand:

> If the court determines on remand that Lindquist expected to be paid only if Miller turned Middleton profitable and that Miller did not turn Middleton profitable after a fair attempt, then the court should enter judgment for Middleton under both quantum meruit and unjust enrichment. If the facts are as Middleton describes them, then Lindquist gambled and lost on its bet. Equity requires that it internalize the consequences.

*Id.* at 483.

This instruction is the focal point of this second appeal. Based on our opinion in *Lindquist I*, there were essentially three scenarios that might have produced a win for Lindquist on retrial: (1) the evidence might have shown that Lindquist reasonably expected to be compensated for Miller's services *even if* he did *not* turn Middleton profitable; (2) the evidence might have shown that Lindquist reasonably expected to be compensated *only if* Miller turned Middleton profitable and that he in fact did so; or (3) the evidence might have shown that Lindquist reasonably expected to be compensated *only if* Miller turned Middleton profitable and that Middleton denied him a fair opportunity to do so.

The district court quickly ruled out the first scenario: "As the court of appeals suspected, negotiations with defendant proceeded on the basis that [Lindquist] would earn no fees until and unless the dealership was showing a profit." Indeed, this particular finding was inevitable. All of the evidence before the court—including the fee provisions in Lindquist's own proposal on June 2, 2003;

the August letter of understanding; and Miller's May 11, 2004 letter demanding only a percentage of profits—established without contradiction that Lindquist did not expect to be paid for Miller's management assistance unless and until the dealership showed a profit. But the court went on to confusingly frame the rest of its analysis in terms of Lindquist's and Miller's compensation expectations. This was error. Having concluded that Lindquist reasonably expected payment only if Miller succeeded in returning Middleton to profitability, no further analysis of the parties' compensation expectations was required.

Our review therefore narrows to the remaining two possible scenarios under which Lindquist's right to an equitable remedy might have arisen. To repeat, the evidence might have shown that Miller in fact returned Middleton to profitability; or alternatively, the evidence might have shown that Miller was fired before he had a fair opportunity to do so. As a factual matter, these are mutually exclusive propositions. But the district court found both to be true. The court found that "[u]sing the general idea of the adjustments contemplated by the parties in their letter of understanding . . ., defendant became profitable by June 2003 and continued to be profitable through March 2004"—the time frame when Miller was on board. The court also found that Miller's "changes helped the dealership produce 'real income' in 2003, that is, income adjusted to GAAP principles." But the court also found that Middleton fired Miller prematurely, without giving him a reasonable

chance to turn the dealership around, "frustrat[ing] [Lindquist's] ability to earn a fair fee."

In light of the obvious tension in these findings, on appeal Lindquist variously characterizes the dealership as being on the "verge of profitability" when Middleton ended the parties' relationship. On the "verge of profitability" is not the same as actually showing a profit; the district court's profitability finding lacked a sound basis in the evidence. The only support for it was Miller's testimony and a "Supplemental Expert Report" designating him as an expert witness (more about this in a moment). Middleton's financial statements conclusively established that Middleton was unprofitable in 2003, 2004, and 2005—before, during, and after Miller's tenure. The only testimony by a Certified Public Accountant came from Schwarz, Middleton's accountant and expert witness. He testified that Middleton's 2003 "adjusted loss" or negative "real income" under GAAP and accounting for LIFO was $171,000. And Lindquist concedes on appeal that when Middleton terminated Miller in March 2004, the dealership showed a year-to-date loss of $29,477.

In the teeth of this uncontroverted evidence, the district court's reliance on Miller's testimony and "expert" report was unsupported. Miller is not a CPA, and his report, which mostly addressed salaries for general managers, did not identify any training or experience that would qualify him to testify as an accounting expert. Lindquist had originally named Woodward as its expert witness; he was the CPA who negotiated the

letter of understanding on its behalf, but Lindquist never called him to testify. Miller's report said only this about Middleton's profitability: "By March 2004, Middleton Motors had already been profitable or was on the verge of being profitable." The evidentiary support for this one-sentence conclusion consists of the six lines of hand-written unsubstantiated calculations Miller included with his May 11, 2004 letter and a spreadsheet with his wholly unexplained adjustments to Middleton's financial statements for April 2003.

Miller's admissions on cross-examination were even more problematic. The letter of understanding defines "real income" as "GAAP income adjusted for LIFO adjustments and other items." On cross-examination Miller admitted that although he purported to base his calculations on the letter's definition, he did not know "what GAAP is," was "never . . . trained in how to determine what is GAAP income," did not "know what GAAP standards say about depreciation," and could not identify the source of his $67,000 LIFO adjustment in his handwritten calculations.

Accordingly, the court's profitability finding cannot stand. Based on the conclusive financial statements, Schwarz's testimony, Miller's admitted lack of expertise, the lack of evidentiary support for his "expert opinion," and the district court's internally inconsistent factual findings regarding the dealership's profitability, it was clear error for the court to find that Middleton produced a profit with Miller at the helm in 2003 and early 2004. *See Platinum Tech.*, 282 F.3d at 931 (factual findings are

clearly erroneous when we are left with a "definite and firm conviction that a mistake has been committed" (quotation marks omitted)).

Lindquist argues that we can nonetheless uphold the judgment based on the district court's finding that Middleton let Miller go before he had a fair opportunity to turn the dealership around. We explained in *Lindquist I* that one of the equitable considerations for the district court on remand with respect to both the quantum-meruit and unjust-enrichment claims was whether Middleton preempted Miller's opportunity to make a "fair attempt" at restoring Middleton to profitability. 557 F.3d at 483. If Miller was ousted prematurely or prevented from exercising meaningful control over management decisions, then the district court might properly conclude that the "circumstances [are] such that it would be inequitable [for Middleton] to retain the benefit [of his services] without payment" under unjust enrichment, *see Seegers*, 236 N.W.2d at 230, or that equity might lie with Lindquist for purposes of quantum meruit, *see Lindquist I*, 557 F.3d at 478. Like the court's profitability determination, however, the district court's findings on this point lack a sufficient basis in the evidence.

In determining that Miller was unfairly terminated before he had a reasonable opportunity to turn the dealership profitable, the district court latched on to three aspects of the parties' negotiations. Most prominently, the court emphasized that the termination language in Lindquist's June 2 proposal stated that if Middleton

ended the parties' relationship prior to January 1, 2005, Lindquist would receive a termination fee and specified how the fee should be calculated. The court thought that this language was evidence of the minimum duration of the "fair opportunity" Miller should have been given to turn Middleton around. In other words, the court thought that Miller reasonably expected that he would have at least that much time to do things his way; termination before that date would give rise to an equitable right to a quasi-contractual remedy. Second, the court relied on the language in the letter of understanding regarding termination for good cause. Finally, the court highlighted the provision in both the June 2 proposal and the letter of understanding emphasizing that Miller would have free rein to put his management policies into effect.

The termination provision from the June 2 proposal might provide some support for the district court's fair-opportunity conclusion if viewed in isolation. But in context, and considered in light of all the evidence, it does not. The letter of understanding, which was circulated approximately three months later, made no mention of the January 1, 2005 date; in fact, it said nothing at all about a contemplated time frame for Miller's effort. Indeed, the letter suggested only that if the parties' relationship was terminated, Lindquist would be paid based on a percentage of the dealership's profits. This evidence echoes the prevailing understanding between the parties that compensation was expected only if and when Miller's efforts put the dealership in the black. Finally, Miller's May 11, 2004 letter implicitly

undermines the district court's finding that Miller's fair opportunity to realize a profit extended to January 1, 2005.[2] In the letter Miller does not specifically claim entitlement to compensation based on a termination fee tied to that date. Nor does he more generally claim that he was entitled to a longer opportunity to implement his changes.

The district court also relied on the "good cause" termination language in the letter of understanding, but this evidence does not contribute much to the analysis of whether Miller was given a fair opportunity to turn a profit. Though the court made two factual findings that might link this evidence to a conclusion that Lindquist was entitled to an equitable remedy, both findings lack sufficient support in the evidence. The first

---

[2] Lindquist argues that this letter constituted a settlement offer and should not be considered. *See* FED. R. EVID. 408 (An offer "to accept a valuable consideration in compromising or attempting to compromise [a] claim" is not admissible on behalf of a party when offered to provide liability for, invalidity of, or the amount of a claim.). Lindquist waived this argument by not objecting to the letter's admissibility on this basis in the district court. FED. R. EVID. 103(a)(1) (To preserve an evidentiary objection for appeal, a party must make a "timely objection or motion to strike . . . stating the specific ground of objection, if the specific ground was not apparent from the context."); *see also Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 727 (7th Cir. 1999) ("When a party fails to timely and properly object at trial to the admission of evidence, the party is deemed to have waived the issue on appeal.").

was that Middleton fired Miller "just as many of his cost-cutting and sales-boosting strategies were beginning to show results." *Lindquist II*, 665 F. Supp. 2d at 1020. The only evidence to support this finding was Miller's testimony and report, and we have already explained why it was error to credit this evidence. Second, the court found that the primary cause for the breakdown in the parties' relationship—Lindquist's failure to come forward with the contemplated cash infusion—was really Middleton's fault. The court thought that Middleton's need for new capital was secondary to its need for management skills. This inference was based on a short line of questioning at trial in which Dave Hudson testified that Middleton had previously considered and rejected an arrangement with Geiger Group, a Wisconsin dealership that might have been able to provide the needed cash infusion but not a general manager. But Dave Hudson did not emphasize the lack of a general manager as the reason he ended negotiations with Geiger. He explained instead that his discussions with Geiger did not proceed beyond the preliminary stage because he did not feel comfortable with Geiger's people. Accordingly, his testimony does not support the court's finding that Middleton's need for cash was secondary to its need for management service. If anything, his testimony establishes that Middleton's capital and management needs were equally important and that investment capital was central to its pursuit of a relationship with another dealership.

The district court also emphasized that Lindquist's June 2 proposal made no mention of a cash-infusion

expectation. The negative inference the court appears to have drawn does not prove very much, especially given the abundant evidence both before and after the June 2 proposal establishing that Middleton's need for cash was always one of its principal concerns. Indeed, that the June 2 proposal entirely omitted the subject was one of the primary reasons Middleton rejected it. The subject of a cash infusion was discussed at the April 17 meeting, and Schwarz's July memos insisted that a capital investment be added to the June 2 proposal because of Middleton's concern that Lindquist would have nothing at risk when Miller implemented major changes at the dealership. The August letter of understanding, written after Lindquist finally agreed to make a capital investment in exchange for a 25% ownership interest in Middleton, confirmed the importance of this issue: "[Lindquist and Middleton] have agreed to enter into an agreement whereby [Lindquist] would provide a cash infusion into [Middleton] and take over management of the operations . . . ." In short, the district court erroneously downplayed the importance of a capital investment as one of Middleton's primary concerns.

The court also found that Middleton itself "dropped the ball" on the subject of the cash infusion, but this finding, too, lacks evidentiary support. The court faulted Dave Hudson for never making a formal demand on Lindquist, drafting a buy-sell agreement for the sale of stock to Lindquist, or suggesting a time to close the transaction. Nothing in the record suggests that he was expected to take these steps; to the contrary, the letter of understanding says only that "Steve Lindquist

and Craig Miller, as individuals, will invest a sum of $500,000." Moreover, as Schwarz testified, Miller had substantially increased Middleton's inventory, putting the dealership at greater financial risk and substantially increasing its cash shortage. This made the contemplated capital investment even more important to the success of the venture and validated that Lindquist's failure to come forward with the cash gave Middleton cause to terminate the relationship. In the end, the good-cause termination language in the August letter of understanding simply cannot bear the weight the district court gave it.

Finally, the district court found that Middleton did not give Miller sufficient autonomy to run the dealership and therefore deprived him of a fair opportunity to restore it to profitability. This finding is in considerable conflict with significant record evidence—much of it cited in the court's opinion—detailing the many changes Miller implemented at the dealership. *See Lindquist II*, 665 F. Supp. 2d at 1014-16. To name a few: Miller negotiated new insurance contracts, eliminated high bonus plans for employees, implemented a new management strategy, changed advertising agencies, increased the amount of advertising, initiated weekly manager meetings to discuss problems and sales goals, and hired and fired employees. All this suggests ample control and autonomy. In comparison, the areas on which Miller complained that Middleton would not compromise—e.g., his suggestion that the dealership eliminate gourmet cookies, hire an employee to clean the aquarium, handle landscaping in-house, and spend less on an accoun-

tant—seem trivial. To the extent that Middleton refused to implement these modest proposals, this evidence is too insignificant to support the court's finding that Middleton denied Miller the authority he needed to turn the dealership around.

In sum, the factual findings underlying the court's decision to impose a quasi-contractual remedy are insufficiently supported by the evidence. Because the judgment is premised on clearly erroneous factual findings, it must be reversed.

## C. Damages

Because we are reversing the liability determination based on clear error, we need not address the court's treatment of the question of damages. We note for completeness, however, that the court did not comply with our remand instructions in *Lindquist I*. We explained that if a quasi-contractual remedy was appropriate at all, quantum-meruit recovery should be based on what Miller's services were worth in the marketplace, and recovery for unjust-enrichment should be based on what Middleton would have paid for a general manager in Miller's absence.[3] *Lindquist I*, 557 F.3d at 477-78. Because

---

[3] The measure of damages for unjust enrichment is limited to the value of the benefit conferred on the defendant. *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 79-80 (Wis. 1996). Quantum-meruit damages, on the other

(continued...)

it was undisputed that Miller managed more than one dealership when he took over as general manager at Middleton, we said that the damages inquiry on remand should focus on how general managers are compensated when they work for several dealerships at once. *Id.* at 483. We also noted an open question about whether general managers in the area are compensated based in part on the dealership's performance; we said that the damages inquiry, if one was necessary, ought to take this question into account. *Id.*

Yet the district court based its damages calculations exclusively on "the average pay . . . for general managers of dealerships in the region including Wisconsin," plus benefits. The court did not directly address how managers are compensated when they work for several dealerships at once—a potentially significant factor in light of Miller's testimony that because he was working for other dealerships, he spent only 50% of his time on matters relating to Middleton during the months between September 2003 and March 2004. The court also did not account for Middleton's expert, who testified that it is not uncommon for managers of multiple dealerships to be compensated in part on a percent of profits. The court *did* address compensation for managers in failing dealerships, concluding, however, that Middleton could not have attracted an experienced general

---

[3] (...continued)

hand, are "measured by the reasonable value of the plaintiff's services." *Ramsey v. Ellis*, 484 N.W.2d 331, 334 (Wis. 1992).

manager by offering a percentage of profits until the dealership was successfully rehabilitated. This conclusion is hard to reconcile with the fact that Miller himself—who had a salary from Lindquist—was willing to assume the risk of no additional salary for the potential reward of a large percentage of any net profit the dealership produced under his management.

### III. Conclusion

For the foregoing reasons, we REVERSE the judgment below and REMAND with instructions to enter judgment for Middleton. There is one remaining loose end to tie up. It is undisputed that Middleton advanced $7,668 to Lindquist and Lindquist paid $6,503.53 to install a T-1 data line. These amounts nearly offset each other, and Middleton asks that our remand include instructions to enter judgment in its favor for the difference. Because Lindquist is not entitled to quasi-contractual compensation for Miller's services under either quantum meruit or unjust enrichment, Middleton is correct that it should recoup the $7,668 it advanced to Lindquist. Middleton has conceded, however, that it must repay the $6,503.53 expense Lindquist incurred to install the T-1 line. This leaves a net recovery for Middleton of $1,164.74. Judgment should be entered accordingly.